# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of an Application to<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information, including location information,<br>associated with Cellular Telephone Assigned Call<br>Number 416-821-1409 and/or the International<br>Mobile Subscriber Identity (IMSI)/Electronic Serial<br>Numbers 3561660960530109, 3561660960530110,<br>3561660960530113 | Case No.20-sw-00681-GPG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ___State and___ District of ___Florida and elsewhere___, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with the Intent to Distribute a Controlled Substance |

The application is based on these facts:

- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Shane M. Gosnell*
*Applicant's signature*

Shane M. Gosnell-Special Agent
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: 6/9/20

*Judge's signature*

City and state: Grand Junction, CO     Gordon P. Gallagher-USMJ
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (416) 821-1409, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBERS 3561660960530109, 3561660960530110, 3561660960530113 THAT IS STORED AT PREMISES CONTROLLED BY AT&T | Case No. _____ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Shane M. Gosnell, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (416) 821-1409, with International Mobile Subscriber Identity/Electronic Serial Numbers 3561660960530109, 3561660960530110, 3561660960530113 ("the SUBJECT PHONE"), that is stored at premises controlled by AT&T, a wireless telephone service provider headquartered at 11760 U.S. Highway One, Suite 600 North Palm Beach, FL 33408.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I am a Special Agent with Homeland Security Investigations (HSI) and have been employed with HSI since January of 2019.  I have been employed as a law enforcement officer for approximately 10 years.  In connection with my official duties, I investigate criminal violations of the Controlled Substances Act, and I have testified in judicial proceedings for violations of laws concerning controlled substances.  During my time in law enforcement, I have participated in numerous drug trafficking investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code.  I have been involved in various types of electronic surveillance, in the execution of search and arrest warrants, and in the debriefing of defendants.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21 United States Code Sections 841 Possession with the Intent to Distribute a Controlled Substance and 846 Conspiracy to Distribute a Controlled Substance, have been committed by Artur BEDNARZ as well as others who are currently known and unknown.  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## PROBABLE CAUSE

5.      On December 10, 2019, troopers with the Colorado State Patrol conducted a traffic stop on a vehicle driven by an individual who would later become a cooperating defendant ("CD").  A consent search of the vehicle led to the discovery and seizure of approximately 150

pounds of Cocaine.  The CD, a citizen and resident of Canada, was arrested.

6. On December 18, 2019, HSI agents obtained a federal search warrant for a laptop computer and a cellular telephone in the possession of the CD at the time of his arrest.  A search of the iPhone and laptop revealed the CD was Facebook "friends" with Artur BEDNARZ.  The search also revealed BEDNARZ's Facebook username as "artur.bednarz.90" and listed BEDNARZ both as a Facebook "friend" and "Facebook messenger" contact with phone number (416) 821-1409 (the SUBJECT PHONE).  Further search revealed the CD was communicating with the SUBJECT PHONE, identified in the CD's phone contacts as "Art."  These communications were primarily through the cellular phone application "Signal."

7. On the date and time of the traffic stop, the CD sent multiple messages in "Signal" to the contact "Art" stating, "I'm Busted in Colorado," "Before Grand Junction." "Art" responded "What happened," "Are you ok."  The CD stated, "Busted," "He's looking in the truck," "Contact [identified individuals] on Facebook," "I will get a lawyer and won't speak," "I'm in the side of the road."  "Art" responded with a "thumbs up" emoji and the conversation stopped.

8. Following his arrest, the CD agreed to cooperate in the investigation.  The CD identified Artur BEDNARZ as an organizer for a Transnational Drug Trafficking Organization ("TDTO") transporting cocaine from California to Canada.  The CD was presented with a photo lineup of six individuals, provided instructions, and asked whether he recognized any of the individuals.  The CD immediately identified the photograph of individual #4 as "Artur BEDNARZ."  This photo was in fact a photograph of BEDNARZ.

9. The CD described BEDNARZ as a businessman, and the owner/operator of a hardwood flooring store in Canada.  A check of databases revealed BEDNARZ is the owner of

Trafalgar Hardwood Floors, Inc., located at 2396 Queensway Drive Burlington, Ontario, Canada L7R 3T3.

10. The CD stated that BEDNARZ was directly involved in the organization and transportation of the approximately 150 pounds of cocaine seized on December 10, 2019. The CD also stated BEDNARZ was responsible for at least four other trips transporting cocaine from California to Canada. The CD estimated the shipments, which the CD was also involved with, all involved a similar amount—approximately 150 pounds—of cocaine. The CD explained that when getting involved with BEDNARZ (for the purpose of transporting cocaine) in approximately July 2019, BEDNARZ stated he had been involved in the transportation of cocaine for approximately two years, and had been contacted by law enforcement one time and had not been caught.

11. The CD said BEDNARZ provided vehicles to the individuals he was paying to transport the cocaine. At least one of the vehicles was registered to BEDNARZ prior to being sold/registered to the individuals transporting cocaine on behalf of the TDTO and BEDNARZ. The CD was able to identify two vehicles used by BEDNARZ and the CD to transport cocaine: a 2017 Honda Ridgeline and a 2012 Toyota RAV4. The CD was stopped in the 2017 Honda Ridgeline on December 10, 2019. Record checks indicate the 2017 Honda Ridgeline driven by the CD on December 10, 2019, was registered to BEDNARZ's business from March 22, 2019, until it was registered to the CD on August 22, 2019.

12. The CD stated the other four trips took place in approximately the end of July 2019 to the first of August 2019, the end of August 2019 to the first of September 2019, the first of November 2019, and the end of November 2019, respectively. The CD further stated the Toyota RAV4 was used on the first trip. The CD stated that this vehicle was driven from

Canada into the United States via the Queenston Bridge at Niagara Falls, NY and driven to Newport Beach, CA.

13. A review of Department of Homeland Security ("DHS") and License Plate Reader ("LPR") databases corroborates the descriptions of trips provided by the CD. More specifically, a check of DHS databases revealed the following:

    a. On July 25, 2019, the Toyota RAV4 crossed inbound into the United States from Canada at Lewiston Queenston Bridge at Niagara Falls, NY.

    b. On August 29, 2019, the Honda Ridgeline crossed inbound into United States from Canada at Buffalo Peace Bridge in Buffalo, NY.

14. Similarly, LPR information shows trips from CA headed east in the general time frames described by the CD.

15. The CD described the transportation/distribution operation. Vehicles used in the transportation of the cocaine from California were stored in storages units in the Los Angeles area. BEDNARZ would meet the individual he was paying to transport the cocaine in California. BEDNARZ would organize with the source of the cocaine for a shipment. BEDNARZ would be contacted by the source advising the shipment was ready. BEDNARZ would rent a vehicle in California to meet with the source to pick up the shipment of cocaine in a public place (generally a parking lot) in the Los Angeles, California, area. BEDNARZ transported the cocaine back to a storage unit where the cocaine was offloaded into one of the transport vehicles. The driver of the vehicle would depart California and drive to the Toledo, Ohio, area. The CD stated BEDNARZ would fly from California to Chicago, rent a vehicle, and drive and meet the driver in the Toledo, Ohio area. BEDNARZ and the driver would take the shipment of cocaine to a location along the roadway specified by BEDNARZ. A semi-truck, or

some other commercial vehicle, would be parked along the roadway as if it was broken down. BEDNARZ and the driver would pull in front of the commercial vehicle, an individual would exit the commercial vehicle and would retrieve the shipment of cocaine for transportation across the U.S./Canada border in the commercial vehicle.

16. On December 10, 2019, at the time of the CD's arrest, law enforcement located the cocaine in a factory compartment in the bed of the Honda Ridgeline. The CD advised when using the Toyota RAV4 the cocaine was concealed and transported in an aftermarket manufactured compartment under the rear deck of the cargo area of the RAV4. Aftermarket manufactured compartments are constructed strictly for the purpose of concealment of contraband and to avoid detection by law enforcement.

17. At the time of the CD's arrest, law enforcement located a business card for a Public Storage account. HSI agents served Public Storage with a subpoena for records. In response, agents received account information showing the CD was the leasee of Public Storage unit #1013 located at 2075 Newport Blvd, Costa Mesa, California 92627. The lease on the unit had been paid through December 31, 2019. The unit had been accessed just prior to the arrest of the CD.

18. HSI agents also served multiple hotels with administrative subpoenas for information regarding records of accounts and stays for Artur BEDNARZ and the CD. Subpoena return information obtained by HSI corroborates statements made by the cooperating defendant concerning travel and hotels stays made by the CD and BEDNARZ during the transportation of cocaine.

19. The CD stated that during one of the trips he observed BEDNARZ receiving text messages and 'Facebook messenger" messages on his iPhone. The cooperating defendant

identified BEDNARZ's iPhone as being associated with the phone number previously identified as (416) 821-1409 (the SUBJECT PHONE).  Shortly after receiving the messages, BEDNARZ told the CD they needed to leave to transfer the cocaine to the semitruck.  Inquiries with AT&T reveal the SUBJECT PHONE, identified as an Apple iPhone XS, was utilizing AT&T towers in the United States during the time frame identified by the CD.

20. The CD said BEDNARZ uses multiple techniques to avoid law enforcement detection.  BEDNARZ used multiple cell phones to communicate, frequently cleared memory on the cell phones, used code when communicating by cell phone, spoke in Polish, used various cell phone applications to communicate (e.g. "Signal App"/"Facebook Messenger"), used various forms of payment to include cash and credit card, rented vehicles to assist in the facilitation of the delivery of the cocaine, and took domestic flights from California to Chicago and back to California prior to flying back to Canada.

21. The CD stated BEDNARZ occasionally asked drivers of the load vehicles to purchase phones on his behalf.  These phones were used for communication and to avoid detection during the transportation of the cocaine.  However, the CD stated that the SUBJECT PHONE is a long-term phone number used by BEDNARZ.

22. The cooperating defendant advised BEDNARZ was in possession of the SUBJECT PHONE during the transportation of cocaine from California to Canada.

23. The Conversation in the "Signal Application" previously referenced and identified during the search of the CD's phone document conversations between the CD and BEDNARZ, utilizing the SUBJECT PHONE, dating back to November 08, 2019.  These communications corroborate the CD's description of travel and meeting with BEDNARZ to transport and distribute cocaine.

(a) For example, on November 8, 2019, the CD sent BEDNARZ a message containing a picture of a Facebook story "Trans American flight 209 "LAX to Chicago." Another message sent later that day contained a photo of the CD sitting in a cockpit; the photo was captioned, "I have friends." A check of DHS databases revealed that on November 8, 2019, the CD flew from Toronto, Canada to Las Vegas, NV via an Air Canada flight.

(b) The following day, the CD sent a picture of a silver Honda Ridgeline to BEDNARZ. The Honda Ridgeline was backed into a storage unit with a black suitcase sitting just outside the unit. The picture included a caption in Polish roughly translated as "I reached."

(c) On November 11, 2019, BEDNARZ sent the CD a message in Polish, roughly translated as "arrange phone." The CD responded in Polish, roughly "Today I will." BEDNARZ responded "ok." Later, the CD sent a message stating "Laguna" with a picture, indicating the picture was from Laguna Beach, CA. BEDNARZ responded in Polish to the effect of "I am." The CD responded in Polish roughly "everything." BEDNARZ responded "Yes" in Polish. The CD later sent a message in Polish to the effect of "I have a plan," "we'll talk." BEDNARZ responded with "thumbs up" and "arm flexing" emojis.

(d) On November 15, 2019, BEDNARZ sent a message to the CD in Polish, which is roughly translated as "I will let you know when I will be." A check of DHS databases revealed on the same date BEDNARZ flew from Toronto, Canada, to Los Angeles, California, via an Air Canada flight. In entry documents, BEDNARZ declared he was staying in Redondo Beach, California. BEDNARZ was confirmed on the flight.

8

(e) The following day, BEDNARZ sent a message to the CD stating, "Come 7:30 Redondo Beach Whole Foods I will take you for nice breakfast." The CD responded in Polish with a message roughly translated as "okay I'll be late a few minutes." The later messages appear to indicate the two met.

(f) The next day, on November 17, 2019, the CD sent BEDNARZ a message in Polish translated as "Thursday noon without a problem." Following, this it appears from the messages that the CD travelled to a predetermined location. During the trip, BEDNARZ sent the CD a message in Polish roughly translated as "let me know how you will be in the woods." The two later have a phone call. The next day, BEDNARZ asks in Polish, "is all good?" The two then again spoke on the phone.

(g) On November 21, 2019, the CD appeared to arrive at the destination, sending a message in Polish stating roughly, "okay, I arrived, I'm here." The CD then attempted to place voice calls to BEDNARZ that went unanswered. BEDNARZ later responded in a text in Polish stating roughly "Sorry, take the same hotel with a nice kitchen, Plaza, tomorrow we are going to the irena for a party." The CD responded, "ok," and BEDNARZ followed up with a message stating in Polish, "I will be there in 4 hours." The messages appear to indicate that the CD and BEDNARZ met later that day.

(h) Between November 22-25, 2019, the messages appear to indicate that the CD travelled back to California. BEDNARZ and the CD remained in consistent communication during the trip.

(i) On November 25, 2019, the CD sent a video to BEDNARZ of what appears to be the silver Honda Ridgeline in a garage with the hood up, having

maintenance done. The video contained the caption "clean." BEDNARZ responded, "ok."

24. A check of DHS records indicates BEDNARZ had travel to the United States consistent with the above reference dates. Furthermore, administrative subpoenas to rental companies show BEDNARZ rented vehicles during his time in the United States, using the SUBJECT PHONE as a contact phone number. The SUBJECT PHONE was listed as both a home phone number and mobile phone number.

25. An open source search of (416) 821-1409 returns an active landline account out of Toronto, Ontario, Canada, operated by Fido Solutions Inc.-QC.

26. An open source search of Fido Solutions Inc. and Rogers Communications Canada Inc. revealed that United States company AT&T is used by the Canadian companies as a service provider while roaming within the United States.

27. Law enforcement database checks reveal BEDNARZ is suspected of being involved in the transportation and distribution of cocaine from California to Canada as far back as December 2017.

28. Information obtained by the provider will assist in the identification of specific locations of interest in the investigation of the transportation of cocaine. The information may also further identify additional co-conspirators.

29. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data

10

identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone, but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.  AT&T also collects and stores "GPS" Global Positioning Satellite information with more precise location information. "GPS" information can be obtained even if the devices cellular data is turned off so long as the device is connected to some other form of service.

30. Based on my training and experience, I know that AT&T can collect cell-site/GPS data about the SUBJECT PHONE.  I also know that wireless providers such as AT&T typically collect and retain cell-site/GPS data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.  Return of subpoena for records in regard to toll information for the SUBJECT PHONE indicates AT&T is in possession of the requested information.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to place the SUBJECT PHONE's user or users at the location where the crimes have been committed, and to identify travel routes, locations of stash houses, or co-conspirators.

31. Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of

11

business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators.

## AUTHORIZATION REQUEST

32.  Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

33.  I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ Shane M. Gosnell*_____
Shane M. Gosnell, Special Agent
Homeland Security Investigations

Subscribed, attested to, and acknowledged by reliable electronic means on June 9, 2020.

_____
Gordon P. Gallagher
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Jeremy Chaffin, Assistant United States Attorney.

13

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (416) 821-1409, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBERS 3561660960530109, 3561660960530110, 3561660960530113 ("the Account"), that are stored at premises controlled by AT&T ("the Provider"), headquartered at 11760 U.S. Highway One, Suite 600 North Palm Beach, FL 33408.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **January 2017 to Present**:

a. The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

   b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii. information regarding the cell towers and sectors through which the communications were sent and received.

        iii. Information regarding the GPS location of the device

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21 United States Code Sections 84, Possession with the Intent to Distribute a Controlled Substance, and 846, Conspiracy to Distribute a Controlled Substance, during the period **January 2017 to Present**.